UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

DENNY MOLINA CANTOR,

            Petitioner,

      v.

JOSEPH FREDEN, et al.,

           Respondents.

———————————————————————

              24-CV-764-LJV
              DECISION & ORDER

The petitioner, Denny Molina Cantor, has been detained in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), since November 16, 2021—more than three years.  Docket Item 1 at ¶¶ 7, 50.  On August 15, 2024, Cantor filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 challenging his ongoing detention at the Buffalo Federal Detention Facility in Batavia, New York, and requesting either his immediate release or a "constitutionally adequate" bond hearing.  Docket Item 1 at 1,[1]  29, and ¶ 7.

The government agreed to provide Cantor with an individualized bond hearing at which the government would bear the burden of proving, by clear and convincing evidence, that Cantor "poses a future danger to the community or a flight risk."  Docket Item 5 at ¶ 1.  The government also agreed that, in determining whether Cantor poses a flight risk, the immigration judge ("IJ") conducting the bond hearing must consider whether that risk of flight could be ameliorated by reasonable conditions of supervision.

---

[1] Docket citations without paragraph numbers refer to ECF pagination.

*Id.* But the government disagreed that the IJ also must consider whether alternatives to detention mitigated Cantor's danger to the community. *Id.* at ¶ 2.

In this context, this Court previously has held that due process mandates that a neutral decisionmaker consider whether alternatives to detention could satisfy the government's interest in mitigating any potential danger to the community posed by a noncitizen detainee. *See, e.g.*, *Davis v. Garland*, 2023 WL 1793575, at *2 (W.D.N.Y. Feb. 7, 2023); *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 241-42 (W.D.N.Y. 2019). Nevertheless, the government argues that the Second Circuit's opinion in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), precludes such a remedy and that "due process does not require consideration of alternatives to detention when dangerousness is shown." Docket Item 8 at 10-11.

For the reasons that follow, this Court disagrees with the government and reaffirms its prior decisions. Accordingly, the Court grants Cantor's petition in part—he must receive an individualized bond hearing at which the government bears the burden of proving, by clear and convincing evidence, that he poses a danger to the community or a flight risk. And at that hearing, a neutral decisionmaker must consider whether alternatives to detention can reasonably address the government's interest in his continuing detention.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Cantor is a native of Honduras.  Docket Item 1 at ¶ 25.  He entered the United States in 2007 "and has not left since."  *Id.*  In 2017, he "became the father of a . . . daughter" with United States citizenship.  *Id.*

More than a decade after he entered the United States, Cantor "was arrested based on an accusation that he sexually abused the minor daughter . . . of his then partner."  *Id.* at ¶ 33.  He subsequently was indicted for violating New York Penal Law ("NYPL") §§ 130.75 (course of sexual conduct against a child in the first degree) and 260.10(1) (endangering the welfare of a child).  Docket Item 1 at ¶ 33.  Prior to trial, Cantor pleaded guilty to endangering the welfare of a child and was sentenced to time served and three years' probation.  *Id.* at ¶¶ 36, 37.  According to Cantor, he was given the opportunity to enter that plea in exchange for the other charge being dismissed after the prosecution, acting under its *Brady* obligations, disclosed evidence that cast doubt on the victim's credibility.  *Id.* at ¶¶ 35-37.

Following Cantor's guilty plea, on November 16, 2021, ICE arrested and detained him.  *Id.* at ¶ 39.  ICE issued a "Notice to Appear" charging that Cantor was subject to removal from the United States under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537.  Docket Item 1 at ¶ 40.   More specifically, ICE charged that Cantor was subject to removal under section 1182(a)(6)(A)(i) for being "present without

---

[2] Unless otherwise noted, the following facts are taken from Cantor's petition, Docket Item 1, and the documents attached to that petition, including his Notice to Appear, Docket Items 1-2 through 1-8.  The Court also takes judicial notice of Cantor's immigration proceedings.  *See Pina Morocho v. Mayorkas*, 2023 WL 1995283, at *3-4 (S.D.N.Y. Jan. 25, 2023) (taking judicial notice of petitioner's immigration proceedings in considering petition).

admission or parole."  Docket Item 1 at ¶ 40; *see also* Docket Item 1-7 (Cantor's Notice to Appear).

Cantor has sought relief from his removal by filing an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Docket Item 1 at ¶ 26.  An IJ granted withholding of removal and CAT protection, but that decision was appealed to the Board of Immigration Appeals ("BIA"), which remanded his case for further fact finding on three issues related to Cantor's application for relief from removal.  *Id.* at ¶¶ 30-31.  As the government indicates, on remand, the IJ (presumably after conducting that fact finding) ordered Cantor's removal.  Docket Item 8 at 6-7.  Cantor has since appealed that removal order to the BIA.[3]  *Id*.

On March 1, 2022, while Cantor pursued that relief from removal, he was given a bond hearing under 8 U.S.C. § 1226(a), at which he "carried the burden to prove he was not a danger to the community."  *Id.* at ¶¶ 41, 45.  After the hearing, the IJ denied bond, finding that Cantor had "submitted insufficient documentation to disprove the abuse allegation."  *Id.* at ¶ 45.  Cantor appealed the IJ's decision to the BIA, which "revers[ed] the IJ's dangerousness finding and remand[ed] the case back to the IJ to reassess [Cantor]'s dangerousness."  *Id.* at ¶ 46.  The BIA found that the IJ had improperly credited "dropped charges considering the exculpatory *Brady* evidence in" Cantor's case.  *Id.*

Cantor received a second bond hearing on February 14, 2023, at which he again had the burden to show that he was not a danger to the community.  *See id.* at ¶¶ 47-

---

[3] In his petition, Cantor said that he "may appeal" a negative BIA decision to the Second Circuit.  *See* Docket Item 1 at ¶ 31.

48.  Again, the IJ denied bond.  *Id.* at ¶ 48.  After Cantor appealed, "the BIA issued a

one sentence[] decision affirming the IJ's decision without opinion, deeming it the final

agency determination."  *Id.* at ¶ 49.

Cantor has remained in detention since November 16, 2021.  *See id.* at ¶¶ 7, 50.

He currently is detained at the Buffalo Federal Detention Facility ("BFDF") in Batavia,

New York.  *Id.* at ¶ 7.  While in custody, "[h]is movement is restricted, . . . he has limited

access to the internet and calls to family and counsel, [he has] no access to a

cellphone, and he is detained far away from his family and counsel."  *Id.* at ¶ 52.  Cantor

also alleges that "[h]e is confined to his cell for 18 to 19 hours a day," *id.*, is being

"denied an adequate wellness diet for his prediabetic condition," *id.*, and is suffering

"anxiety, depression[,] and auditory hallucinations."  *Id.* at ¶ 53.

The conditions of his confinement at BFDF led Cantor to file a complaint with the

DHS Inspector General, the DHS Office for Civil Rights and Civil Liberties, and the

Office of the Immigration Detention Ombudsman.  *Id.*  That complaint raised the same

allegations about the conditions of his detention and also "detail[ed] . . . additional

instances of the many failures and abuses perpetrated by staff relating [to] their

interactions with detainees and responses to medical emergencies."  *Id.*

On August 15, 2024, Cantor filed a petitioner for a writ of habeas corpus under

28 U.S.C. § 2241 with this Court.  *See* Docket Item 1.  Cantor's petition alleges that by

not placing the burden to demonstrate dangerousness on the government, the two bond

hearings he received violated his Fifth Amendment right to due process, did not comport

with the statutory procedures contained in 18 U.S.C. § 1226(a), and were arbitrary and

capricious in violation of the Administrative Procedure Act.  *Id.* at ¶¶ 79-95.  Cantor

therefore asked this Court to grant his petition and order that he be immediately released or, in the alternative, given a "constitutionally adequate" bond hearing at which the government would bear the burden of proving, "by clear and convincing evidence, that his continued detention is warranted due to dangerousness or flight risk that cannot be sufficiently mitigated by a detention alternative or reasonable monetary bond." *Id.* at ¶ 6.

As discussed above, Cantor and the government subsequently stipulated that the government would provide Cantor "with an individualized bond hearing before an [IJ] at which the government bears the burden of establishing, by clear and convincing evidence, that [Cantor] poses a future danger to the community or a flight risk."  Docket Item 5 at ¶ 1.  The parties also agreed that at the individualized bond hearing, "[i]n determining whether the government has carried its burden of establishing that [Cantor] is a flight risk, the [IJ] must consider whether such risk may be mitigated by reasonable conditions of supervision or monetary bond."  *Id.*  Finally, they agreed that "[i]f the [IJ] sets a monetary bond, he or she must consider [Cantor]'s ability to pay in determining the appropriate bond amount."  *Id.*

But Cantor and the government disagreed about one requirement of the bond hearing: "whether the [IJ] must also consider, when determining [whether] the government has carried its burden of establishing that [Cantor] poses a danger to the community, whether danger to the community may be mitigated by alternatives to detention, such as reasonable conditions of supervision or monetary bond."  *Id.* at ¶ 2. Cantor and the respondents therefore briefed the issue, Docket Items 7, 8, and 9, and

asked this Court to decide it. *See* Docket Item 5 at ¶ 3. The Court then heard oral argument, Docket Item 12.

## DISCUSSION

Cantor says that due process requires an IJ to consider alternatives to detention in determining whether he poses a danger to the community. *See* Docket Item 7 at 5-14; *see also* Docket Item 1 at ¶¶ 80-81 (claiming that Cantor's two prior bond hearings, at which he bore the burden of proving that he did not pose a danger or flight risk, violated his right to due process). The government disagrees, arguing that the Second Circuit's opinion in *Black* precludes considering alternatives to detention once there has been a finding that the noncitizen detainee poses a danger to the community. *See* Docket Item 8 at 7-13. For the reasons that follow, this Court agrees with Cantor.

The Fifth Amendment's Due Process Clause forbids the government from depriving any "person . . . of . . . liberty . . . without due process of law." U.S. Const. amend. V. "[T]he Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020). Although the Due Process Clause is not offended by the mandatory detention of noncitizens for the "brief period necessary for their removal proceedings," *see Demore v. Kim*, 538 U.S. 510, 513 (2003), it may be violated by detention beyond that "brief" period, depending on the balance between the individual's and the government's interests, *see, e.g.*, *id.* at 532-33 (Kennedy, J., concurring); *see also Velasco Lopez*, 978 F.3d at 853 ("'[A]s the period of . . . confinement grows,' so do the required procedural protections no matter what level of due process may have been

sufficient at the moment of initial detention." (alteration in original) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001)).

This Court "has evaluated procedural due process challenges to immigration detention with a two-step inquiry." *Davis v. Garland*, 2022 WL 17155828, at *5 (W.D.N.Y. Nov. 22, 2022) (quoting *Hemans v. Searls*, 2019 WL 955353, at *5 (W.D.N.Y. Feb. 27, 2019)). First, the Court decides whether the noncitizen's detention has become unreasonably prolonged. *Davis*, 2023 WL 1793575, at *4. If it has, the Court "then considers what process is necessary to justify that detention," *id.*, looking to the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Velasco Lopez*, 978 F.3d at 851. Under that test, the Court "evaluates (A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." *Nelson v. Colorado*, 581 U.S. 128, 135 (2017). "The ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action." *Mathews*, 424 U.S. at 348.

At the first step, the government does not appear to dispute that Cantor's detention has become unreasonably prolonged. And for good reason—at more than three years, it almost certainly has. *See, e.g.*, *Iwu v. Searls*, 2024 WL 2176945, at *3-5 (W.D.N.Y. May 15, 2024) (finding that noncitizen's detention of more than 17 months was unreasonably prolonged); *Davis*, 2022 WL 17155828, at *5 (noncitizen's detention for more than three years was unreasonably prolonged); *see generally Hemans*, 2019 WL 955353, at *6-7 (summarizing considerations relevant to evaluating whether detention is unreasonably prolonged).

Because Cantor's detention has become unreasonably prolonged, this Court turns to the second step—the process necessary to justify his detention. And as this Court has repeatedly held, once a noncitizen's detention has become unreasonably prolonged, the government must generally demonstrate, by clear and convincing evidence at an individualized hearing before a neutral decisionmaker, that the noncitizen's continued detention is justified. *Davis*, 2023 WL 1793575, at *4 (collecting cases). This includes "consider[ing] whether less-restrictive alternatives to detention can reasonably serve the government's interest in detaining the noncitizen." *Id.* (citing *Tapia Lopez v. Garland*, 2022 WL 3009530, at *7 (W.D.N.Y. July 29, 2022)).

The government says that it is prepared to give Cantor "an individualized bond hearing." Docket Item 5 at ¶ 1. And as discussed earlier, the government agrees with Cantor on the procedures that will be used to analyze his flight risk. *See id.* The only area of disagreement concerns whether, at that hearing, due process compels the IJ to consider "whether danger to the community may be mitigated by alternatives to detention." *See id.* at ¶ 2. Cantor argues that due process requires the IJ to do so, while "[t]he government maintains that a finding of dangerousness precludes release[.]" *See id.*

## I.    PROCEDURAL DUE PROCESS

As it always does in cases like this, this Court analyzes the issue under the guidance provided by *Mathews*. *See Velasco Lopez*, 978 F.3d at 851; *see also Black*, 103 F.4th at 155 (noting that "the *Mathews* factors again serve as our guide" in analyzing procedures ordered by district court for bond hearing).

### A.    The Private Interest Affected

Cantor's interest here "is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)).  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.  And "[c]ase after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Velasco Lopez*, 978 F.3d at 851 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)).

Cantor has now been detained for more than three years while he contests his removability from the United States.  *See* Docket Item 1 at ¶¶ 26-27, 31.  The deprivation he has experienced during that time is substantial:  He is incarcerated and "confined to his cell for 18 to 19 hours a day"; he is so far away from his family that "neither his family nor counsel has been able to travel to visit him in person"; and he has no access to a cell phone.  *Id.* at ¶ 52.

Without this Court's intervention, those conditions likely will continue for the foreseeable future, as there is no administrative mechanism by which Cantor can challenge his detention.  *See Velasco Lopez*, 978 F.3d at 852.  As the Second Circuit noted in *Velasco Lopez*, "[d]etention under [section] 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded." *Id.*  "Absent release on bond . . . detention lasts through the initial removal determination proceedings (which themselves can take months or years) and all inter-agency and federal court appeals, even where an individual has prevailed and the [g]overnment appeals." *Id.*

That length of detention is relevant because "[w]here the Supreme Court has upheld detention during the pendency of removal proceedings"—such as in *Demore*— "it has been careful to emphasize the importance of the relatively short duration of detention."  *Id.* (citing *Demore*, 538 U.S. at 529); *see also Demore*, 538 U.S. at 529 ("[I]n 85% of the cases in which [noncitizens] are detained pursuant to [section] 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days.  In the remaining 15% of cases, in which the [noncitizen] appeals the decision of the [IJ] to the [BIA], appeal takes an average of four months, with a median time that is slightly shorter." (citations omitted)).  By any calculus, Cantor's three years of detention far exceed the short period emphasized in *Demore* and may well continue without an end in sight, especially given Cantor's appeal pending before the BIA, Docket Item 8 at 6-7, and the possibility of him further appealing any adverse BIA decision to the Second Circuit.  *See* Docket Item 1 at ¶ 31.

The government argues that Cantor's liberty interest "is undercut by the fact that he can gain his liberty at any time of his choosing[] by acquiescing to removal and departing [from] the United States."  Docket Item 8 at 14.  But that mischaracterizes Cantor's liberty interest: it "is not liberty in the abstract, but liberty *in the United States*." *See Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999).  Indeed, as this Court has previously observed, that interest in liberty *in the United States* must be strong for a petitioner to subject himself to detention during a lengthy appeals process.  *See, e.g.*, *Fremont v. Barr*, 2019 WL 1471006, at *6 n.7 (W.D.N.Y. Apr. 3, 2019) ("[N]o rational person would subject himself or herself to unreasonably prolonged detention in a jail-

like detention facility unless that person's liberty interests in remaining in the United States are quite strong.").

Given the strength of Cantor's interest, the length of his confinement, and the uncertainty about when that confinement might end, the first *Mathews* factor weighs in his favor.

**B.    The Risk of Erroneous Deprivation and the Value of Additional Procedural Safeguards**

Under the second *Mathews* factor, the Court considers "the risk of an erroneous deprivation of [the individual's liberty] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *See Mathews*, 424 U.S. at 335; *see also Huanga v. Decker*, 599 F. Supp. 3d 131, 144 (S.D.N.Y. 2022) ("[T]he question is whether this procedure [used at the prior bond hearing] presented a substantial risk of an 'erroneous deprivation'— that is, a wrongful determination that [the petitioner] was a danger to the community."). In light of his lengthy confinement and the procedures used thus far, this factor likewise weighs in Cantor's favor. That is, failing to consider whether alternatives to detention may ameliorate any danger posed by Cantor's release creates a significant risk that he will be erroneously deprived of his liberty interest.

When the government seeks someone's civil detention to effect a compelling regulatory purpose, it must show by clear and convincing evidence that such detention is necessary to serve that compelling purpose and that it has "some reasonable relation to the purpose for which the individual is committed." *See Foucha v. Louisiana*, 504 U.S. 71, 79, 81-83 (1992); *Addington v. Texas*, 441 U.S. 418, 432-33 (1979). "For that reason, it is not enough for a neutral decisionmaker to find that a noncitizen poses a

12

danger in some general or abstract sense; rather, the decisionmaker must consider whether detention is truly justified under the particular circumstances." *Davis*, 2023 WL 1793575, at *6.

Due process thus mandates particularized findings—usually after an evidentiary hearing—to sustain the prolonged detention of a noncitizen based on the government's general interest in detaining those here unlawfully. More specifically, the "[g]overnment [is] required, in a 'full-blown adversary hearing,' to convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person," *Foucha*, 504 U.S. at 81 (quoting *Salerno*, 481 U.S. at 750), or that the noncitizen will appear for a future hearing, *see Hemans*, 2019 WL 955353, at *8 & n.7 (explaining that the clear and convincing standard applies to the flight risk determination). And contrary to the government's argument here, a neutral decisionmaker cannot possibly make that determination without considering less restrictive alternatives to detention. *See Foucha,* 504 U.S. at 81 (quoting *Salerno*, 481 U.S. at 751); *cf. United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to" a regulation burdening a constitutional right, "it is the [g]overnment's obligation to prove that the alternative will be ineffective to achieve its goals.").

As this Court has previously asked: "How can an [IJ] decide that a noncitizen's detention is necessary to prevent danger to the community unless the [IJ] also considers alternatives that might eliminate that danger?" *Davis*, 2023 WL 1793575, at *7. For example, a noncitizen with a history of drunk driving might well pose a serious danger to the community. "But that danger would be ameliorated if the noncitizen were

13

released on the condition that he or she not drive a car," *id.*, or that he or she wear a remote alcohol monitoring device. Or consider Cantor, who was convicted for endangering the welfare of a child. Docket Item 1 at ¶¶ 33-37. A neutral decisionmaker cannot fully evaluate the danger he poses to the community without first weighing the mitigating effect of alternatives to detention, such as Cantor's release on the condition that he wear an ankle monitor, or that he be confined to his home, or that he not have any contact with children in general or the victim in particular.

Perhaps conditions will be insufficient to mitigate the danger. But the IJ cannot make that determination—indeed, the IJ cannot decide whether the noncitizen poses a danger—until the IJ considers conditions that might ameliorate the danger. That is simply common sense.

In sum, failing to consider whether alternatives to detention might ameliorate any danger to the public posed by Cantor's release clearly impacts the risk that he will be wrongfully detained without any means of challenging the length of his detention. The second factor thus weighs in his favor and supports the consideration of alternatives to detention in evaluating any potential danger that Cantor poses to the community.

### C.    The Government's Interest

Finally, the Court recognizes that the government's interest in detaining Cantor may well be very strong. *See Velasco Lopez*, 978 F.3d at 854-55 (noting that the government's "interests in detaining noncitizens under [section] 1226(a) is (1) ensuring that noncitizen[s] do not abscond and (2) ensuring they do not commit crimes.").[4] It is

---

[4] *Mathews* also recognizes that the government has an interest in avoiding the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *See Mathews*, 424 U.S. at 335. The government has not

certainly true that "[t]he government's interest in preventing crime by arrestees is both
legitimate and compelling."  *Salerno*, 481 U.S. at 749.

But what is less clear is whether the government has a significant interest in
detaining noncitizens when the risk of danger can be ameliorated by reasonable
conditions of release.  The potentially reduced significance of the government's interest
is even more pronounced here, considering that Cantor has been detained for over
three years.  *See Velasco Lopez*, 978 F.3d at 855 ("[T]he longer detention continues,
the greater the need for the [g]overnment to justify its continuation.").  And even more
basically, if the government's interests can be met not only by detention but also by
imposing conditions of release, then the balance likely will weigh in favor of release.

The government argues that the Second Circuit's opinion in *Black* forecloses this
by "recogniz[ing] that dangerousness is different from risk of flight."  Docket Item 8 at
10.  Under the government's reading of *Black*, "the ability to pay and alternatives to
detention [are] only to assure the noncitizen's appearance" and "are relevant 'only once
the IJ has determined that the noncitizen does not pose a danger to the community.'"
*Id.* (quoting *Black*, 103 F.4th at 158-59).  Therefore, the government says, "due process
does not require consideration of alternatives to detention when dangerousness is
shown."  *Id.* at 11.

But that misreads *Black*, which addressed only risk of flight and not
dangerousness.[5]  In *Black*, the district court had ordered a bond hearing at which the

---

identified any increased fiscal and administrative burdens that would come from
requiring an IJ to consider alternatives to detention in assessing Cantor's
dangerousness.

[5] Cantor is correct that *Black*—which involved detention under 8 U.S.C. §
1226(c), not 1226(a)—is not directly binding here.  Docket Item 7 at 17 ("*Black*'s

government bore the burden of justifying by clear and convincing evidence that the petitioner posed a risk of flight or a danger to the community. *Black v. Decker*, 2020 WL 4260994, at *9 (S.D.N.Y. July 23, 2020). In making that determination, the district court explicitly ordered that the IJ "consider [the] [p]etitioner's ability to pay and the availability of alternative means of *assuring his appearance*." *Id.* (emphasis added). The court said nothing about whether the IJ also had to consider alternatives to detention in making a dangerousness determination, which was not at issue there.

On appeal,[6] the government argued that the district court's order required the IJ to consider bail and other alternatives to detention that might ensure the petitioner's appearance even if his release would pose a danger to the community. *See Black*, 103 F.4th at 158. The Second Circuit disagreed:

> We do not read the district court's order in that way: it required only that 'the IJ . . . consider [the p]etitioner's ability to pay and the availability of alternative means of *assuring his appearance*.' *Black*, 2020 WL 4260994, at *9 (emphasis added). The district court said nothing about considering ability to pay and alternative means of assuring appearance *despite* a finding that the noncitizen is a danger to the community. But to the extent the district court's order might be read as the government suggests, we

_____

discussion of the procedures that should be afforded to individuals subject to 8 U.S.C. § 1226(c) detention is not binding on 8 U.S.C. § 1226(a) detention."). But that does not mean that its reasoning is irrelevant. *Black*'s analysis of the petitioners' due process challenges was, like this Court's analysis of Cantor's petition, conducted under the *Mathews* framework. *Black*, 103 F.4th at 148-49. Indeed, *Black* found that *Velasco Lopez*'s use of the *Mathews* framework to analyze challenges to detention under 8 U.S.C. § 1226(a) was relevant and persuasive to its analysis under section 1226(c), even if it was not binding. *See Black*, 103 F.4th at 149.

[6] *Black* involved two petitioners whose respective cases were consolidated on appeal. *See Black*, 103 F.4th at 137. As the Second Circuit noted, one petitioner had been granted habeas relief, *Black*, 2020 WL 4260994, at *9-10, while the other petitioner had been denied relief by the district court, *Keisy G.M. v. Decker*, 2021 WL 5567670, at *1-2 (S.D.N.Y. Nov. 29, 2021). *Black*, 103 F.4th at 138.

stress that a showing of dangerousness by clear and convincing evidence would foreclose any possibility of bond. The IJ would then have no reason to consider financial circumstances or alternatives to detention.

*Black*, 103 F4th at 158-59 (emphasis and parenthetical in original).

Here, the government emphasizes the words "alternatives to detention," reasoning that because this "recognize[s] that dangerousness is different from risk of flight," alternatives to detention "[a]re only to assure the noncitizen's appearance" and therefore need not be considered once a finding of dangerousness is made. *See* Docket Item 8 at 10-11. But because *Black*'s focus was on bail and other means of assuring the petitioner's appearance,[7] its reference to "alternatives to detention" is limited to that—that is, alternatives to detention that ameliorate the risk of flight. *Black* says nothing about whether, in deciding whether a petitioner poses a danger to the public upon release, an IJ must consider alternatives to detention that might ameliorate that danger.[8]  And for the reasons just explained, there is no conceptual or practical reason to address conditions that might ameliorate danger when assessing

---

[7] Indeed, the other language in *Black* cited by the government maintains that same focus on alternative means to ensure petitioners' attendance at immigration proceedings, not alternatives relevant to mitigating dangerousness. *See Black*, 103 F.4th at 158 ("[A] bond amount would be at issue only once the IJ has determined that the noncitizen does not pose a danger to the community . . ..  At that point, refusing to consider ability to pay and *alternative means of assuring appearance* creates a serious risk that the noncitizen will erroneously be deprived of the right to liberty purely for financial reasons." *Id.* at 158 (emphasis added) (citing *Carlson v. Landon*, 342 U.S. 524, 539-42 (1952), and *Matter of Guerra*, 24 I. & N. Dec. 37, 38 (B.I.A. 2006)).

[8] In fact, the government's reading of *Black* might have the ironic result of constraining the broad discretion that IJs enjoy under federal regulations.  *See* 8 C.F.R. § 1003.19(d) ("The determination of the [IJ] as to custody status or bond may be based *upon any information* that is available to the [IJ] or that is presented to him or her by the alien or [ICE].") (emphasis added); *see also Abdi v. Nielsen*, 287 F. Supp. 3d 327, 338 (W.D.N.Y. 2018) (BIA precedent "suggest[s] that IJs have significant discretion to determine whether release on bond is appropriate.").

dangerousness any differently than the risk-of-flight analysis requires for conditions that might ameliorate that risk.

The government also argues that "[u]nlike the risk of flight, which an ankle monitor could make futile or else rectify by showing a noncitizen's location, the risk of harm to the community cannot be mitigated merely by knowing where [Cantor] is." Docket Item 8 at 14. But that simply means that conditions that might ameliorate risk of flight will be insufficient to ameliorate danger and that there will be fewer instances when conditions will suffice to mitigate the latter. And that may well be true, but that is not a reason to analyze the two risks any differently.

There may well be no alternatives to detention that will be sufficient to release Cantor safely. And it may well be more challenging to come up with conditions that ameliorate risk of danger in the same way that bail or ankle bracelets ameliorate risk of flight. But that is no reason to analyze the two risks any differently, and this Court does not believe that the panel in *Black* intended to suggest otherwise. This Court therefore holds that when a petitioner is entitled to a hearing because his detention pending removal has become unreasonably prolonged, the hearing requires a neutral decisionmaker to address whether alternatives to detention might ameliorate risk of danger as well as risk of flight.

### D.    Conclusion

In sum, all three *Mathews* factors weigh in Cantor's favor. And in light of his exceptionally prolonged detention, due process demands that his continued detention be justified not only by a finding that he poses a danger to the community but also by a finding that the danger cannot be reasonably addressed by alternatives to detention.

## II.      REMEDY

Cantor's petition requested either his "immediate release or a constitutionally adequate bond hearing."  Docket Item 1 at ¶ 6.  Under the stipulation between the parties, the government will provide Cantor with an individualized bond hearing before an IJ at which it bears the burden of establishing, by clear and convincing evidence, that Cantor poses a risk of flight or danger to the community.  Docket Item 5 at ¶ 1.  In determining whether Cantor poses a flight risk, the IJ must consider whether that risk "may be mitigated by reasonable conditions of supervision or monetary bond."  *Id.*  In addition, and consistent with this decision and due process, in determining whether Cantor poses a danger to the community, the IJ also must consider whether that danger may be mitigated by reasonable alternatives to detention.

To the extent that the petitioner's request for his immediate release remains at issue, *see* Docket Item 1 at 29, this Court declines to grant that remedy in deference to the legitimate and strong governmental interests described earlier, *see supra* Section I.C.

## CONCLUSION

For the reasons stated above, Cantor's petition is granted in part.[9]  Within 14 calendar days from the date of this decision and order, the government must release

---

[9] Because this Court finds that due process mandates that Cantor receive an individualized bond hearing at which the government bears the burden of proving, by clear and convincing evidence, that he poses a risk of flight or danger to the community, *see supra* Section II, it need not reach his claims that his two prior bond hearings violated 8 U.S.C. § 1226(a) and the Administrative Procedure Act, Docket Item 1 at ¶¶ 83-95.

Cantor unless it demonstrates by clear and convincing evidence before a neutral decisionmaker that Cantor's continued detention is necessary to serve a compelling regulatory purpose, such as minimizing risk of flight or protecting others or the community.  As part of that calculus, the decisionmaker must consider—and must address in any decision—whether there is clear and convincing evidence that there are no less-restrictive alternatives to physical detention, including release on conditions, that would reasonably address the government's interest in detaining Cantor.  In other words, the decisionmaker must find, by clear and convincing evidence, that no condition or combination of conditions of release can reasonably ensure Cantor's appearance and the safety of the community—that is, even with conditions, Cantor presents an identified and articulable risk of flight or a threat to another person or the community.

Within 30 days of the date of this decision and order, the government shall file an affidavit certifying compliance with this order.  That affidavit should include a copy of the bond hearing order.

SO ORDERED.

Dated:   January 7, 2025
         Buffalo, New York

_/s/ Lawrence J. Vilardo_
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE